DIAMOND v WITHERSPOON
MOODY v WITHERSPOON

Docket Nos. 252657, 252658. Submitted March 15, 2005, at Detroit.
Decided April 12, 2005, at 9:10 a.m.

Denise Diamond brought an action in the Wayne Circuit Court
against David Witherspoon and the city of Detroit. Toyia Moody
and Stephanie Bennett together brought another action against
the same parties. The actions were consolidated for trial. The
complaints included allegations of violations of the Civil Rights Act
(CRA), specifically MCL 37.2302, by Witherspoon, a city police
officer, who committed criminal sexual conduct against the plain-
tiffs during traffic stops instead of issuing tickets for the alleged
traffic violations. The city moved for summary disposition, arguing
that it had governmental immunity under MCL 691.1401 et seq.,
and that the plaintiffs had failed to state a claim under the CRA
because they were not denied public services because of their sex,
but were subjected to criminal behavior by Witherspoon. The
court, Gershwin A. Drain, J., denied the motion. Witherspoon
accepted mediation and did not proceed to trial. The plaintiffs
proceeded against the city only on a theory of quid pro quo sexual
harassment. At the close of proofs, the city moved for a directed
verdict, arguing that Witherspoon's illegal acts fell outside the
scope of legitimate law enforcement, that the CRA protections
against sexual harassment applied only in an employment context,
and that the plaintiffs had failed to prove that Witherspoon acted
in a prejudicial manner because of the plaintiffs' sex. The court
denied the motion. The jury returned a total verdict of $7.5 million
against the city and allocated the city's fault at thirty-five percent.
The court entered a judgment of $2.625 million against the city for
the plaintiffs' past and future damages. The court denied the city's
motion for judgment notwithstanding the verdict, new trial, or
remittitur. The city appealed.

The Court of Appeals held:

1. The sexual discrimination provisions of the CRA apply in
circumstances outside employment relationships, including a situ-
ation in which an individual's access to public services is affected
or denied. Sexual harassment is a subset of the sex discrimination

prohibited under the CRA. Quid pro quo sexual harassment in a case such as this requires proof that (1) a plaintiff was subjected to unwanted or unwelcome sexual advances, requests, conduct, or communications and (2) that a provider of public services or the provider's agent used submission to or rejection of the proscribed conduct as a factor in a decision to provide public services. The city's police services are public services. The plaintiffs were subjected to unwelcome sexual conduct when Witherspoon sexually propositioned, groped, and photographed them during what they believed were authorized traffic stops. Witherspoon, as the city's agent, used the plaintiffs' submission to or rejection of his advances as a factor in his decision to provide or deny police services, that is, to treat the plaintiffs in the manner expected during a traffic stop rather than asking them to submit to sexual acts in exchange for terminating the traffic stops and releasing them from police authority. Quid pro quo sexual harassment does not require that the victim intend to bargain, or believe that she is bargaining, for a certain result in deciding to submit to or reject the sexual advances. While the sexual assaults were criminal, they also fall within the ambit of the CRA.

2. Governmental immunity is not a defense to a claim brought under the CRA, which expressly includes political subdivision as entities covered by the act.

3. Because the plaintiffs properly brought their causes of action under the CRA and the city is not entitled to governmental immunity, the trial court properly instructed the jury regarding the CRA.

4. The trial court did not abuse its discretion in denying the city's motion for remittitur. The trial court's inquiry on a motion for remittitur is whether the evidence supported the jury award, and is limited to objective considerations regarding the evidence presented and the conduct of the trial. The trial court's decision must be given due deference and reversed only if there is no justification for the ruling. The city did not allege any type of objective misconduct and provided no awards in similar cases for comparison, and the record reveals that the plaintiffs suffered differing levels of depression and anxiety after their incidents.

Affirmed.

1. CIVIL RIGHTS — SEX DISCRIMINATION — SEXUAL HARASSMENT — POLICE CONDUCT.

It is quid pro quo sexual harassment in the provision of public services and a violation of the Civil Rights Act for a police officer to subject an individual to prohibited sexual conduct or communi-

cations, including criminal sexual conduct, during a traffic stop and to use the individual's submission to or rejection of that sexual conduct or communication as a factor in the officer's decision to provide or deny police services, including treating the individual in the manner expected during a traffic stop and releasing the individual from police authority (MCL 37.2103[i], 37.2302).

2. GOVERNMENTAL IMMUNITY — CIVIL RIGHTS VIOLATIONS.

Governmental immunity is not a defense to a claim brought under the Civil Rights Act, which includes the state and political subdivisions as entities covered by that act (MCL 37.2103, 691.1401).

3. JUDGMENTS — JURY VERDICTS — REMITTITUR.

A trial court's inquiry on a motion for remittitur is whether the evidence supported the jury award, and is limited to objective considerations regarding the evidence presented and the conduct of the trial.

*Amos E. Williams* and *Thomas E. Kuhn* for the plaintiffs.

*Ruth C. Carter*, Corporation Counsel, *Linda D. Fegins*, Senior Assistant Corporation Counsel, and *Sheri L. Whyte*, Assistant Corporation Counsel, for the city of Detroit.

Before: FORT HOOD, P.J., and GRIFFIN and DONOFRIO, JJ.

DONOFRIO, J. Defendant city of Detroit appeals as of right from a judgment of $2.625 million entered on a jury verdict awarding plaintiffs $7.5 million as a result of violations of the Civil Rights Act (CRA), MCL 37.2302, and allocating fault of thirty-five percent against defendant. The action involved violations of the CRA in which defendant's employee, David Witherspoon, a police sergeant, committed criminal sexual conduct against the three plaintiffs. Defendant now appeals, arguing among other things that the trial court erred when it failed to find as a matter of law that

plaintiffs were not denied any public services under the CRA because of their sex, but instead were subjected to criminal assault.[1] Because we conclude that the CRA does encompass the instant facts as a matter of law, and that plaintiffs were denied public services because of their sex, we affirm.

### I. SUBSTANTIVE FACTS

This action arises out of the criminal sexual conduct committed by former Detroit Police Sergeant David Witherspoon. Witherspoon admitted stopping all three plaintiffs on separate occasions in 1999 and 2000. Instead of issuing tickets to plaintiffs for the alleged traffic violations, Witherspoon initiated sexual contact and photographed plaintiffs Toyia Moody and Denise Diamond with their breasts bared. Regarding plaintiff Stephanie Bennett, Witherspoon photographed her while clothed, pulled at her dress, and attempted to touch her. It is undisputed that Witherspoon pleaded guilty on three counts of extortion, MCL 750.213, and three counts of second-degree criminal sexual conduct, MCL 750.520c(1)(c), in connection with the assaults on plaintiffs.[2] Witherspoon is currently serving concurrent sentences of three to fifteen years and three to twenty years in prison.

#### A. PLAINTIFF BENNETT

In June 1999, Witherspoon, while in uniform and in a marked police car, stopped Bennett's vehicle on Seven

---

[1] Plaintiffs initially cross-appealed, arguing only that fault cannot be allocated between a principal and an agent when the basis of liability is respondeat superior, but plaintiffs withdrew their cross-appeal and we did not consider it in the determination of this appeal.

[2] Witherspoon did not participate in the litigation or in this appeal because plaintiffs and Witherspoon accepted mediation before trial.

Mile Road. When Bennett asked if she was getting a ticket, Witherspoon answered that "it depended." Bennett's fiancé arrived at the scene, exchanged words with Bennett, and left. Witherspoon stated that he would follow Bennett to her home. He then motioned for her to stop, and he and Bennett got out of their vehicles. He asked Bennett for her telephone number, and then returned with a camera and took Bennett's photograph. Witherspoon told Bennett that he wanted to see her breasts and began tugging at her dress, but Bennett pushed him away. He told her that he knew of a dark place where they could go, and placed her hand on his penis and asked if she wanted to be a part of a ménage a trois. He fondled her breasts as she returned to her vehicle. Witherspoon asked about Bennett's fantasies, and she told him to masturbate in the street. As she walked to her vehicle, Bennett saw that Witherspoon had taken his penis out of his pants. Later, Witherspoon telephoned Bennett, telling her that he had bought her lingerie and asking her to be a part of a threesome. He called again, but Bennett would not speak to him. Witherspoon did not issue a ticket or take further action.

### B. PLAINTIFF DIAMOND

On September 7, 1999, Witherspoon stopped Diamond for a traffic violation on Seven Mile Road. Diamond did not have a driver's license. Witherspoon then went back to his vehicle and called to her over the loudspeaker. Diamond got out of her car and walked back to the squad car. Witherspoon told her that he could take her to jail or they could make some kind of "arrangement." Witherspoon told Diamond that he was a "freak" and enjoyed threesomes, and suggested that they have sex. He pulled out his penis and asked her to

rub it, which she did. Witherspoon asked Diamond to put her mouth on his penis, which she also did. He told her to lift up her shirt. When she did so, Witherspoon took a photograph. Witherspoon then told her to expose her buttocks and took a photograph. Witherspoon did not issue a ticket or take further action.

### C. PLAINTIFF MOODY

On February 6, 2000, Witherspoon stopped Moody for a traffic violation on Seven Mile Road. Witherspoon called Moody back to the squad car via the loudspeaker and discussed her suspended license. Defendant told Moody that he was married but wanted someone to make him feel good and that he was into threesomes. Witherspoon told Moody to return to her vehicle and followed her with two cameras. Witherspoon told Moody to unbutton her jacket and take her breasts out of her bra. He took photographs with both cameras. Moody refused Witherspoon's request to remove her pants. Witherspoon told Moody to touch his penis, which she did through his clothes. Witherspoon asked Moody to go with him to a side street, but she made excuses. Witherspoon gave Moody a torn piece of cardboard with a telephone number on it. Moody noted that Witherspoon was wearing a nametag with "H. Whitehead" on it. The next day, Moody reported the incident and the Internal Affairs Division of the Detroit Police Department investigated. Witherspoon did not issue a ticket or take further action.

### II. PROCEDURAL HISTORY

Plaintiffs filed their suits in 2001, and they were consolidated in the trial court. The original complaints and both subsequent amended complaints alleged violations of 42 USC 1983 and the CRA, specifically MCL

37.2302, by defendant. The federal claim was removed to federal court, and the claim that was tried against defendant was the state sexual harassment claim under the CRA.

Before trial, defendant moved for summary disposition under both MCR 2.116(C)(7) and MCR 2.116(C)(10), arguing that it was entitled to governmental immunity pursuant to the governmental tort liability act (GTLA), MCL 691.1401 *et seq.* Additionally, defendant argued that even without governmental immunity, plaintiffs' CRA claims failed because plaintiffs were not denied public services because of their sex, but were subjected to criminal behavior perpetrated by Witherspoon. After entertaining oral argument on the issues and requesting additional briefing from the parties, the court denied the motion, finding that "plaintiffs could succeed in establishing a violation of the Elliot-Larsen Civil Rights Act."

Immediately before trial, along with other motions in limine, defendant requested that plaintiffs be precluded from mentioning any evidence illustrating notice by defendant of Witherspoon's sexual conduct, either on- or off-duty. Plaintiffs stipulated that they would make no mention of Witherspoon's other sexual conduct if that meant defendant would concede notice. Defendant conceded that plaintiffs need not prove the element of notice in the action. Thereafter, the matter proceeded to a jury trial in which plaintiffs elected to proceed only on the theory of quid pro quo sexual harassment.

At the close of the proofs, defendant moved for a directed verdict, arguing again that the evidence adduced at trial showed that Witherspoon's illegal acts were committed outside the scope of legitimate law enforcement. Although plaintiffs did not ultimately proceed on a theory of hostile environment sexual

harassment, defendant argued that plaintiffs had not established as a matter of law that the CRA applied in this context, since claims for both quid pro quo and hostile environment sexual harassment under the CRA could only be brought in an employment setting. Finally, defendant admitted that the language of the CRA is broad with the "intention . . . to insure equal access to police accommodation and to services," stating that even if the CRA did apply in this context, plaintiffs had not established that Witherspoon acted in a prejudicial manner on the basis of sex. The trial court denied the motion, stating that it had already ruled on the legal arguments during defendant's motion for summary disposition and found that, viewing the evidence in a light most favorable to plaintiffs, the facts would support a prima facie case under the CRA.

The jury returned a total verdict against defendant in the amount of $7.5 million[3] and allocated the defendant's fault at thirty-five percent. The trial court then entered judgment in the amount of $2.625 million (thirty-five percent of $7.5 million) against defendant. The trial court denied defendant's motion for judgment notwithstanding the verdict (JNOV), new trial, or remittitur and plaintiffs' motion for JNOV on the sole issue of allocation of fault. This appeal followed.

### III. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision to grant summary disposition. *Spiek v Dep't of Transportation*, 456 Mich 331, 337; 572 NW2d 201 (1998).

---

[3] The total verdict represented individual damage awards as follows: Bennett—$1 million past compensatory damages and $800,000 future damages; Moody—$1.5 million past compensatory damages and $1.1 million future damages; and Diamond—$1.9 million past compensatory damages and $1.2 million future damages.

Defendant moved for summary disposition under MCR 2.116(C)(7) and (C)(10). A motion under MCR 2.116(C)(10) tests the factual sufficiency of a plaintiff's claim. *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). The trial court must consider the submitted evidence in the light most favorable to the nonmoving party. *Id.*; MCR 2.116(G)(5). If the proffered evidence fails to establish that a disputed material issue of fact remains for trial, summary disposition is properly granted to the party so entitled as a matter of law. MCR 2.116(C)(10), (G)(4), and (I)(1); *Maiden, supra* at 120.

"We review de novo a trial court's decision on a motion for summary disposition under MCR 2.116(C)(7) to determine if the moving party was entitled to judgment as a matter of law." *McDowell v Detroit*, 264 Mich App 337, 346; 690 NW2d 513 (2004). "A motion under MCR 2.116(C)(7) ' " 'tests whether a claim is barred because of immunity granted by law, and requires consideration of all documentary evidence filed or submitted by the parties.' " ' " *Id.* at 345, quoting *Maskery v Univ of Michigan Bd of Regents*, 468 Mich 609, 613; 664 NW2d 165 (2003), quoting *Glancy v City of Roseville*, 457 Mich 580, 583; 577 NW2d 897 (1998), quoting *Wade v Dep't of Corrections*, 439 Mich 158, 162, 483 NW2d 26 (1992); see also MCR 2.116(G)(5).

This Court reviews de novo the trial court's decisions on a motion for a directed verdict and a motion for JNOV. See *Wilkinson v Lee*, 463 Mich 388, 391; 617 NW2d 305 (2000). A directed verdict is appropriate only when no factual question exists on which reasonable jurors could differ. *Cacevic v Simplimatic Engineering Co (On Remand)*, 248 Mich App 670, 679-680; 645 NW2d 287 (2001). The appellate court reviews all the evidence presented up to the time of the directed verdict

motion, considers that evidence in the light most favorable to the nonmoving party, and determines whether a question of fact existed. *Id.* at 679. In reviewing the decision on a motion for JNOV, this Court views the testimony and all legitimate inferences drawn from the testimony in the light most favorable to the nonmoving party. *Forge v Smith*, 458 Mich 198, 204; 580 NW2d 876 (1998). If reasonable jurors could honestly have reached different conclusions, the jury verdict must stand. *Central Cartage Co v Fewless*, 232 Mich App 517, 524; 591 NW2d 422 (1998).

Whether statutory language permits a cause of action is a legal question that this Court reviews de novo. See, generally, *Beason v Beason*, 435 Mich 791, 805; 460 NW2d 207 (1990).

### IV. ANALYSIS

#### A. CIVIL RIGHTS ACT

Defendant argues that plaintiffs have not stated a cognizable claim of sexual discrimination under the CRA. Defendant asserts that plaintiffs have failed to plead a cause of action that imposes liability under the CRA. Specifically, defendant argues that plaintiffs did not plead, and cannot prove, that they were denied access to public services or accommodations, namely police services, and for that reason their CRA claim fails as a matter of law. Defendant asserts that plaintiffs were not denied public services because of their sex and, as such, the CRA does not apply. For those reasons, defendant argues that the trial court should have granted defendant's motions for summary disposition and directed verdict.

Plaintiffs counter that defendant's police services fall squarely within the CRA. Plaintiffs assert that Wither-

spoon discriminated against plaintiffs because of their sex when he degraded and sexually assaulted each of them while on duty. It is plaintiffs' position that each plaintiff suffered quid pro quo sexual harassment when Witherspoon made their compliance with his sexual advances a condition of releasing them from his police authority and effectively denied them equal access to public police services because of their sex.

The CRA provides, in pertinent part:

> Except where permitted by law, a person shall not:
>
> (a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status. [MCL 37.2302.]

The essence of a sex discrimination civil rights suit is that similarly situated persons have received disparate treatment because of their sex. *Radtke v Everett,* 442 Mich 368, 379; 501 NW2d 155 (1993); *Schellenberg v Rochester Lodge No 2225 of the Benevolent & Protective Order of Elks,* 228 Mich App 20, 34; 577 NW2d 163 (1998). Sexual harassment is considered a subset of sex discrimination. *Chambers v Trettco, Inc,* 463 Mich 297, 315; 614 NW2d 910 (2000); *Koester v City of Novi,* 458 Mich 1, 11; 580 NW2d 835 (1998); MCL 37.2103(i).

The CRA further provides:

> Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions:
>
> (i) Submission to the conduct or communication is made a term or condition either explicitly or implicitly to obtain employment, public accommodations or public services, education, or housing.
>
> (ii) Submission to or rejection of the conduct or commu-

nication by an individual is used as a factor in decisions affecting the individual's employment, public accommodations or public services, education, or housing.

(iii) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment. [MCL 37.2103(i).]

Sexual harassment that falls into one of the first two subsections is referred to as quid pro quo sexual harassment. *Chambers, supra* at 310. Sexual harassment that falls into the third subsection is commonly labeled hostile environment sexual harassment. *Id.* Plaintiffs chose to proceed to the jury in the circuit court strictly on a theory of quid pro quo sexual harassment, and therefore this appeal concerns only quid pro quo sexual harassment.[4]

Even a brief review of case law will reveal that, indeed, the vast majority of sexual harassment claims brought under the CRA are in the context of employment situations, as defendant points out. However, we begin our analysis of the issue by studying the text of the applicable statutes. The fundamental aim of statutory construction is to give effect to the intent of the Legislature. *Erb Lumber, Inc v Gidley*, 234 Mich App 387, 392; 594 NW2d 81 (1999). This Court must look at the specific statutory language and, if it is " 'clear and unambiguous, judicial construction is neither required nor permitted, and courts must apply the statute as written.' " *Id.*, quoting *USAA Ins Co v Houston Gen Ins Co*, 220 Mich App 386, 389; 559 NW2d 98 (1996).

---

[4] Because it is not before us, we express no opinion whether this set of facts could create a claim for hostile environment sexual harassment.

Furthermore, "a court may read nothing into an unambiguous statute that is not within the manifest intent of the Legislature as derived from the words of the statute itself." *Roberts v Mecosta Co Gen Hosp,* 466 Mich 57, 63; 642 NW2d 663 (2002).

The CRA sexual harassment subsets, MCL 37.2103(i)(i) to (iii) address not only employment, as argued by defendant, but also discrimination in public services, public accommodations, educational institutions, and housing. According to MCL 37.2103(i)(iii), sexual harassment includes unwelcome sexual conduct or advances that have "the purpose or effect of substantially interfering with an individual's . . . public accommodations or public services . . . or creating an intimidating, hostile, or offensive . . . public accommodations [or] public services . . . environment." Clearly, the plain language of the CRA includes situations outside the realm of employment where an individual's access to public accommodations or public services is affected.

Because the CRA does apply in circumstances outside employment relationships, the next step in the analysis is to determine whether plaintiffs were denied access to public services or accommodations. Defendant argues that it was entitled to summary disposition because plaintiffs did not sufficiently allege they were denied public services as a result of Witherspoon's criminal conduct. It is defendant's position that, because plaintiffs were in no way denied police services or any other public accommodation or service because of their sex, the instant facts do not fit within the intended scope of the CRA. Plaintiffs counter by arguing that defendant's police services fall squarely within the CRA as a public service or accommodation. Further, plaintiffs assert that the facts clearly show that Witherspoon discriminated against them because of their sex when he

sexually assaulted them and effectively denied them access to public police services.

The purpose of the CRA is to prevent discrimination in employment and housing and other real estate, and to ensure full and equal utilization of public accommodations, public services, and educational facilities. MCL 37.2102(1). The opportunity to obtain the full and equal utilization of a public service without the discrimination because of sex prohibited by the CRA is recognized and declared a civil right. *Id.* A person alleging a violation of the CRA may bring a civil action for either injunctive relief or damages, or both. MCL 37.2801.

As stated earlier, discrimination because of sex includes sexual harassment. Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature when the conduct or communication has the purpose or effect of substantially interfering with an individual's public services. MCL 37.2103(i).[5] A city shall not deny an individual the full and equal enjoyment of services and privileges of a place of public service because of sex. MCL 37.2103(g) and (h); MCL 37.2302. The CRA defines "public service" as being essentially some "agency established to provide service to the public . . . ." MCL 37.2301(b). Specifically, MCL 37.2301(b) provides that "public service"

> means a public facility, department, agency, board, or commission, owned, operated, or managed by or on behalf of the state, a political subdivision, or an agency thereof or a tax exempt private agency established to provide service to the public, except that public service does not include a

---

[5] We do not engage in a hostile environment sexual harassment analysis, but refer to language found in MCL 37.2103(i)(iii) only for guidance in the definition of sexual harassment in this quid pro quo context.

state or county correctional facility with respect to actions and decisions regarding an individual serving a sentence of imprisonment.

In *Kassab v Michigan Basic Prop Ins Ass'n,* 441 Mich 433, 439; 491 NW2d 545 (1992), our Supreme Court concluded that the focus of § 2302 of the CRA, MCL 37.2302, is "on *denial of access* to a place of public accommodations or public services." (Emphasis in original.) In *Kassab,* the Court found that because the complaint did not allege denial of access to public accommodations, it was beyond the scope of the legislative purpose of the CRA to provide redress to plaintiff. *Id.* at 440-441. Here, the complaint alleges that plaintiffs were denied public services because of their sex. Thus, it is within the scope of the CRA, and the issue is whether the CRA encompasses these facts as a matter of law.

Defendant asserts that plaintiffs were in no way "denied" police services because of their sex. Defendant states that this is not an instance, for example, in which plaintiffs contacted the police for service and were refused service unless they first agreed to have sex. Defendant relies on *Dockweiler v Wentzell,* 169 Mich App 368; 425 NW2d 468 (1988). The *Dockweiler* plaintiff sought professional counseling services from the defendant mental health facility's staff psychologist. She was treated by the psychologist for eleven months, during which time he made sexual advances to her, threatened her with sexual assault, touched her sexually, and ultimately had sexual intercourse with her. *Id.* at 370. The plaintiff filed suit under the CRA, but did not allege that the psychologist's actions toward her were made a condition of obtaining mental health services at the facility. She did not allege that his actions had the effect of substantially interfering with

the public services rendered to her. Further, the defendant facility alleged that, if the plaintiff questioned the propriety of the therapy, she only had to "walk away," request a new counselor, or complain to a higher authority. *Id.* at 374.

The instant case is easily distinguishable because plaintiffs had public police services imposed on them by defendant, and they were not free to leave the public services environment created when Witherspoon stopped and detained each plaintiff. Witherspoon used his position as a uniformed police officer in a marked police car to stop each plaintiff, detain her against her will, exert authority over her, and finally humiliate and sexually assault her. In fact, Witherspoon made plaintiffs' compliance with his sexual advances a condition of releasing them from his police authority. Plaintiffs argue, and this Court agrees that unlike *Dockweiler*, plaintiffs were not free to "walk away" from Witherspoon, an on-duty, uniformed police officer exerting apparent authority over plaintiffs. Moreover, in this case, plaintiffs alleged that Witherspoon stopped them for no legitimate public service reason, that Witherspoon required sexual favors as a quid pro quo for not arresting or ticketing them, that submission to Witherspoon's conduct was made a condition of obtaining police services, e.g., release from police custody, and that Witherspoon's actions had the effect of substantially interfering with the public services rendered to them, services to which they were entitled without regard to sex or sexuality.

To establish a claim of quid pro quo sexual harassment in the provision of public services, a plaintiff must demonstrate, by a preponderance of the evidence, that (1) he or she was subjected to unwelcome sexual conduct or communications as described in the statute, and

(2) that the public service provider or the public service provider's agent used submission to or rejection of the proscribed conduct as a factor in a decision affecting the decision to provide public services. MCL 37.2103(i); see also *Chambers, supra* at 310.

Plaintiffs were denied access to public accommodations or public services when Witherspoon committed the sex-based offenses. All three plaintiffs were subjected to unwelcome sexual conduct or communications as described in the statute when Witherspoon sexually propositioned, groped, and photographed them during what plaintiffs' believed was an authorized police stop of their respective vehicles. And Witherspoon, as a public service provider's agent, used plaintiffs' submission to or rejection of his advances as a factor in his decision to provide public services, i.e., to treat plaintiffs in the manner expected during an ordinary police stop and to properly terminate the stop rather than ask plaintiffs to submit to a sexual act in exchange for termination of the stop. See MCL 37.2103(i); see also *Chambers, supra* at 310. There is ample record evidence that plaintiffs' sex and submission to or rejection of sexual advances played the singular role in Witherspoon's decision to deny public services to plaintiffs. Defendant's argument that each of the three plaintiffs stated that she did not "make a deal" with Witherspoon to avoid being ticketed or arrested and that this undermines a claim for quid pro quo sexual harassment is without merit. The elements of a claim of quid pro quo sexual harassment do not require the victim to intend to bargain, or believe that he or she is bargaining, for a certain result when the victim makes the decision to submit to, or reject, the sexual advances. All that is required is that Witherspoon, as a public service provider's agent, used plaintiffs' submission to or rejection of his advances as a factor in his decision to provide or

deny public services, which the record evidence shows he did. Plaintiffs established a sufficient case of quid pro quo sexual harassment to allow the cause of action to proceed to a jury determination.

After studying the language of the CRA, we conclude that the facts of this case, as established, were sufficient to submit to the jury the question whether Witherspoon's actions amounted to sexual harassment. Witherspoon's actions while on duty as a uniformed police sergeant implicated stereotypes and biases against women on the basis of sex in the provision of public services, which is exactly what the CRA is intended to address and prevent. Witherspoon acted with both gender and sexual prejudice in mind when he treated plaintiffs as merely female sexual targets. The sexual assaults committed by Witherspoon, although criminal, also fall within the CRA. Plaintiffs used the requisite CRA language in their complaints, and provided record evidence of Witherspoon's disparate treatment of them on the basis of sex alone, thereby successfully pleading and presenting a statutory cause of action under the CRA for quid pro quo sexual harassment.

For these reasons, we conclude that plaintiffs' claims do fall within the ambit of the CRA, and the trial court correctly denied defendant's motion for summary disposition. Further, because the evidence adduced at trial only further supported plaintiffs' assertions of fact and arguments during the summary disposition phase of trial, the trial court properly denied defendant's motions for directed verdict and judgment notwithstanding the verdict.

### B. GOVERNMENTAL TORT LIABILITY ACT

Defendant argues that it is immune from any liability because no exception applies to the immunity granted

to it under the GTLA. This argument is misplaced inasmuch as plaintiffs brought suit against defendant under the CRA, not under an exception to governmental immunity.

Governmental immunity is not a defense to a claim brought under the CRA. The Legislature has allowed specific actions against the government to stand, such as one under the CRA. *Mack v Detroit,* 467 Mich 186, 195 n 9; 649 NW2d 47 (2002), citing *Manning v Hazel Park,* 202 Mich App 685, 699; 509 NW2d 874 (1993). The CRA specifically includes state and political subdivisions as entities covered by the act. MCL 37.2103(g) and (h).

Further, we note the case cited by defendant, *Dockweiler,* is distinguishable because it did not involve a sufficient claim under the CRA. The CRA expressly includes political subdivisions such as cities. In contrast, *Dockweiler* involved the Mental Health Code, which does not expressly include relief against public mental health facilities. The Mental Health Code merely provides, in general, that mental health patients could pursue "injunctive and other appropriate civil relief." MCL 330.1722(3). Because the Legislature did not provide that public mental health facilities could be liable under MCL 330.1722, the *Dockweiler* Court concluded that public health facilities were immune under the GTLA when engaged in their governmental function. *Dockweiler, supra* at 376-377. Dockweiler is readily distinguishable and does not govern here. The trial court properly denied defendant's motion for summary disposition based on governmental immunity.

### C. JURY INSTRUCTIONS

Defendant argues that this Court must reverse the jury verdict because the jury instructions were errone-

ous as a matter of law. "This Court 'review[s] jury instructions in their entirety to determine whether the instructions given adequately informed the jury regarding the applicable law reflecting and reflected by the evidentiary claims in the particular case.' " *Novi v Woodson,* 251 Mich App 614, 630; 651 NW2d 448 (2002), quoting *Rickwalt v Richfield Lakes Corp,* 246 Mich App 450, 459; 633 NW2d 418 (2001).

Defendant asserts that, because plaintiffs' causes of action were improperly brought under the CRA, and because defendant is governmentally immune from liability, the trial court's instructions were erroneous as a matter of law. As we concluded above, plaintiffs' properly brought their causes of action under the CRA, and defendant is not governmentally immune from liability. As such, our review of the instructions reveals that the trial court properly instructed the jury regarding the CRA. We conclude that defendant's assertion that the jury instructions regarding the CRA were erroneous as a matter of law fails.

### D. REMITTITUR

Defendant argues that the trial court clearly abused its discretion in denying defendant's motion for remittitur because the amount awarded to plaintiffs in the jury's verdict was outrageous and unsupported by the evidence. This Court reviews a trial court's decision to deny a motion for remittitur for an abuse of discretion. *Palenkas v Beaumont Hosp,* 432 Mich 527, 531; 443 NW2d 354 (1989). Our Supreme Court explained in *Palenkas*:

> [T]he question of the excessiveness of a jury verdict is generally one for the trial court in the first instance. The trial court, having witnessed all the testimony and evidence as well as having had the unique opportunity to

evaluate the jury's reaction to the proofs and to the individual witnesses, is in the best position to make an informed decision regarding the excessiveness of the verdict. Accordingly, an appellate court must accord due deference to the trial court's decision and may only disturb a grant or denial of remittitur if an abuse of discretion is shown. [*Id.*]

When reviewing a trial's court's decision regarding remittitur, this Court must view the evidence in the light most favorable to the nonmoving party. *Wiley v Henry Ford Cottage Hosp,* 257 Mich App 488, 499; 668 NW2d 402 (2003). "An abuse of discretion exists where an unprejudiced person, considering the facts on which the trial court made its decision, would conclude that there was no justification for the ruling made." *Szymanski v Brown,* 221 Mich App 423, 431; 562 NW2d 212 (1997).

Defendant specifically argues that the jury award is obviously excessive and should be set aside because the amount is greater than the highest amount the evidence will support. Defendant admits that the evidence showed Witherspoon's behavior was sexually offensive and that plaintiffs suffered "normal emotional distress as a result of one encounter," but points to the fact that none of the plaintiffs ever had continuing care for emotional distress. Defendant stresses that the evidence showed that all three plaintiffs had returned to their normal level of functioning consistent with activities before the incidents.

In determining whether to grant a motion for remittitur a trial court must consider whether the evidence supported the jury award. *Henry v Detroit,* 234 Mich App 405, 414; 594 NW2d 107 (1999). The trial court's inquiry is limited to objective considerations regarding the evidence presented and the conduct of the trial. *Palenkas, supra* at 532-533; *Weiss v Hodge (After Remand),* 223 Mich App 620, 637; 567 NW2d 468 (1997).

Remittitur is justified when a jury verdict exceeds the highest amount the evidence will support. MCR 2.611(E)(1). When determining whether an award is excessive, a court may consider whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact, whether it was within the limits of what reasonable minds would deem to be just compensation for the injury inflicted, and whether the amount actually awarded is comparable to other awards in similar cases. *Palenkas, supra* at 532-533. A verdict should not be set aside simply because the method of computation used by the jury in assessing damages cannot be determined, unless it is not within the range of evidence presented at trial. *Green v Evans,* 156 Mich App 145, 156-157; 401 NW2d 250 (1985).

This Court must accord the trial court due deference on this issue and only reverse if "there was no justification for the ruling made." *Szymanski, supra* at 431. Defendant did not allege any type of objective misconduct (i.e., that the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact) and provided no similar cases for comparison purposes. *Palenkas, supra* at 532-533. Absent any alleged misconduct or similar cases for comparison, and because the record includes evidence that plaintiffs suffered differing levels of depression and anxiety after the incidents, the trial court's denial of remittitur was justified. We may not disturb the trial court's ruling given the trial court's determination that the aggregate sum of $2.625 million was supported by the evidence. *Id.*

### V. CONCLUSION

Plaintiffs' claims fall within the ambit of the CRA, and the trial court correctly denied defendant's motion

for summary disposition on this basis. The trial court properly denied defendant's motion for summary disposition based on governmental immunity. Since the evidence adduced at trial only further supported plaintiffs' assertions of fact and arguments during the summary disposition phase of trial, the trial court properly denied defendant's motions for directed verdict and JNOV. A review of the instructions reveals that the trial court properly instructed the jury regarding the CRA. Because there was evidence supporting plaintiffs' individual claims, the trial court's denial of remittitur was justified and this Court may not disturb the trial court's ruling.

Affirmed.